No. 2410609, but you may get yourselves organized. Thank you. All right, sir. May it please the Court. Good morning, Your Honors. My name is James Risfett with Consumer Justice Law Firm on behalf of Appellant John Boyd. This matter comes to the Court on appeal from the District Court's granting of a motion to dismiss filed by Cleara with respect to Mr. Boyd's claims arising under the Federal Fair Credit Reporting Act. The dismissal was granted based on personal jurisdiction grounds. The specific issues on appeal before the Court are largely these kind of narrow issues arising under specific personal jurisdiction. Respectfully, the District Court's holding errs in a number of respects. Number one, the District Court's holding fails to apply the proper analysis that the Supreme Court laid out in the 2023 Ford decision. Specifically, the disjunctive arises out of or relates to tests. Second, the District Court failed to consider certain allegations raised by plaintiff or appellant rather than plaintiff arising under the arises out of test. There's also a policy ground that we've enumerated within Appellant's opening brief with respect to consumers bringing claims under the Federal Fair Credit Reporting Act. In the alternative, should this Court determine that it is not inclined to reverse the District Court's errors, at minimum, appellant should have been afforded the opportunity based on the allegations raised in the complaint to engage in some form of jurisdictional discovery to ascertain foundational questions about whether or not personal jurisdiction and the contacts that Cleara contends do not exist, do in fact exist. I don't think anybody needs to go over the personal jurisdiction standard laid out in International SHU, but I do think a brief discussion of Justice Kagan's decision in Ford— Now, wait a minute, wait a minute, wait a minute. You didn't even raise Ford until the reply brief in the District Court, right? No, Ford was laid out in our—oh, apologies. You're saying in the District Court brief? Yes, sir. Yes, Your Honor, and ultimately I think that our arguments at the District Court level, candidly speaking, this does not seem a close case to me, and ultimately we believe that the International SHU minimum contacts tests should have necessarily resulted in the District Court determining that those minimum contacts did in fact exist, either under the arises out of or relates to standard. The response with respect to the reply brief is largely predicated upon the fact that, again, we believe these to be fairly straightforward questions with respect to Cleara's conduct. The District Court's decision and ultimately Cleara's primary position seems to improperly narrow the issues that are before the Court. Largely, they focus on the questions of Cleara's conduct as it relates specifically to the background reporting in question. In other words, Cleara's relationship with RentGro, who is another consumer reporting agency, and then RentGro's downstream relationship with the landlord who actually purchased the background report from RentGro directly. However, laid out in appellant's briefs at both the appellate level and the District Court level, there are other questions concerning contacts that Cleara very clearly has with the State of Texas. Specifically, Cleara engages in the purchasing of public records from Texas courts, from Texas public agencies, and it does so in a recurring, ongoing, continuing, systemic basis. The very nature of consumer reporting is such that one does not simply buy records one time and then say, well, no one's ever going to get arrested again, so we've got all the records we need in perpetuity. If a company like Cleara did so, they would not be relevant to their customer base for very long. In other words, they are required by virtue of their business model to maintain those types of ongoing connections, ongoing contacts with the State of Texas. The Ford holding specifically lays out these disjunctive tests for arises out of or relates to when a defendant's conduct is tantamount to these contacts with the forum state that the plaintiff's suit is either, again, arising out of those contacts or related to. The District Court's holding focuses only on this very narrow question of the arises out of standard, and again, very respectfully, with all deference, I think improperly applies the standard laid out by this court in defense. I'm just looking at Judge Means's order, and I don't see a single citation to Ford. That's correct, Your Honor, and Judge Means does refer to the arises out of standard laid bare in international issue, but does not then touch on the disjunctive nature that was enumerated by Justice Kagan in Ford. Well, did he not refer to it because you didn't argue it timely? No, I don't believe so, Your Honor, because I think the theory is still the same, regardless of whether it's argued with a cite under international issue or with a cite to Ford. Well, a lot of people think that Ford sort of modified, added a twist to the discussion that hadn't been there before. I think I would agree in some respects, Your Honor. My view of Ford is that Justice Kagan's holding refined our understanding of international issue as opposed to enumerating this new standard. I understand one of the concurring decisions, I believe Justice Gorsuch, sort of outlines this other theory that I believe Your Honor is referring to in terms of kind of expanding the concepts of personal jurisdiction under international issue. I think that at least from the jurisprudence I've seen interpreting the Ford standard, it's more of an understanding that this simply refines our existing understanding of international issue as it relates to the questions of specifics. I mean, even if that's true, you still have a complex contractual situation here. And all of the other cases, as far as I'm aware of, had to do with the plaintiff having some sort of relationship directly with the defendant. And the question was for specific jurisdiction is whether the defendant's contacts with regard to that relationship are sufficient for due process. Whereas here, as you say, this plaintiff, and I'm sorry about his predicament for sure, this plaintiff was dealing with a landlord who was dealing with rent grow and clear his way in the background. Yes, Your Honor. And no specific plaintiff-clearer relationship. I would agree. And I think my understanding of the relates to standard is that if the defendant's contacts with the state relate to, and in fact, in Ford, I think Justice Kagan details this process of even though Ford did not in those instances with the drivers in Montana, in Minnesota, even though there was no sort of direct contacts as Your Honor is discussing, the court in Ford says that the fact that there's not this direct causal relationship, I think Justice Kagan specifically comments and says that Well, the plaintiff was driving a Ford. That was the contact. Well, right, Your Honor. And I think my point was that in that case, Ford argued, hey, we didn't sell these vehicles directly to this driver. In other words, we don't have that direct causal link. And I think that Justice Kagan's decision in Ford lays out this notion that this kind of causation-only argument is only part of the discussion under specific personal jurisdiction. The relation to is this other concept that Justice Kagan talks about with the advertising throughout the state Here, I don't think there's anybody saying that a background reporting company has the same advertising budget as Ford Motor Company. There's nobody who's saying that they've got billboards and advertisements on television. However, CLRA does have deliberate direct contacts with the state of Texas because it consistently buys records from the state of Texas, and it buys those records for the purposes of reselling those records. I would also note that Judge Means-Holding does make presumptions and resolves them in favor of CLRA, which is flipping the standard of review at the pleading stage on its head, in that Judge Means-Holding says something to the effect of presumably consumers could go anywhere in the country, and a report about somebody with Texas criminal records could theoretically be related to a background report for, say, a property at a home not in the state of Texas. Number one, I would say that that's a presumption in favor of CLRA that's being resolved by Judge Means in contravention of that pleading standard. However, number two, I think this really relates to appellant's allegations that CLRA either knew that Mr. Boyd was located in the state of Texas by virtue of potentially communications between RentGro and CLRA for the purposes of identifying Mr. Boyd, who is the subject of the background report, or they reasonably should have known that Mr. Boyd was a resident of Texas by virtue of the fact that he has criminal records that were being reported about him within the state of Texas. While it is true that people do have the freedom to move state to state, I can tell you as a former background reporting executive that, by and large, when people have a criminal record that is associated or even a civil litigation record that is associated with a particular state, while not universally the case, most commonly it necessarily connotes that that person winds up residing either in that county, that state, potentially even that city. Counsel, I heard you say earlier, and I gather from your blue brief, that you think that credit reporting agencies are subject to specific personal jurisdiction in all 50 states by the nature of their business model. They have to, right? As you say, they've got these continuing, ongoing, general requirements to collect criminal. You said, well, if they were just doing it once, then they would just be presuming that no crimes or arrests were ever going to be done again, and so that would be silly. They wouldn't be able to serve their customers. So obviously they have ongoing contacts with all 50 states in order to keep their databases current, correct? I think I would agree largely with that statement, Your Honor. It's your statement. So I'm just trying to make sure I understand it. Yes. So I think that in CLRA's case, yes, that's absolutely the case. I think the hair-splitting distinction I would make there is that there are background reporting agencies that do not rely upon automated database searches in any context. In other words, they have folks who are going to the courthouse physically, sitting down at the terminal, running record searches, and in those instances, I would argue that, yes, if they are in fact procuring records from a particular jurisdiction for the purposes of reselling those records, then absolutely they should be understandably hailed into court in that jurisdiction in the event that they've reported information from that jurisdiction incorrectly. So let's just focus for a minute on credit reporting agencies like CLRA that use Internet searches and automatic Internet scrubbing. Sure. What is your understanding of the distinction between specific personal jurisdiction and general jurisdiction? So general jurisdiction, obviously, if they are at home such that they have ongoing continuous contacts and are continually subject to personal jurisdiction there, it would be generalized jurisdiction. I think I understand the distinction Your Honor is attempting to make in terms of the conflating of general and specific jurisdiction. I think my — the distinction I would draw between them is that if you do operate a nationwide enterprise and you are ultimately reaching directly into all 50 states deliberately, continuously, and ongoing, then if there is something that arises out of those specific contacts, then yes, you should be subject to specific personal jurisdiction. I don't believe that if there were other potential issues that CLRA — that took place with respect to CLRA, that if it was completely unrelated to some background report they had produced containing records in Texas, that they would be subject to generalized personal jurisdiction in Texas nonetheless. So CLRA is at home in how many states? I think ultimately two states, Pennsylvania and Maryland, and I would argue that they are subject to specific personal jurisdiction in any state where they are actively, ongoing, making deliberate contacts with that state for the purposes of consumer reporting. So they're at home in two states, but they're subject to personal jurisdiction in all 50? If they participate in business relationships seeking, purchasing, and reporting public records from all 50 states, then I would say yes, Your Honor, for the same reasons that national companies like Experian, Equifax, and TransUnion, who do business in all 50 states in continuing, ongoing ways, are all subject to personal jurisdiction in all 50 states. There's nothing that requires CLRA to report information about Texas residents, and I think I would point to the Bristol-Myers-Squibb decision where the Supreme Court talks about we don't want defendants sort of getting called into jurisdictions that have no earthly interest in the dispute. Texas certainly has an interest in its public records being reported correctly. Texas has an interest in landlords not being fed inaccurate information. Texas has an interest in tenants being able to secure a home without having to worry about whether inaccurate information is going to be reported about them, essentially amounting to common-law defamation-type causes of action. So to Your Honor's point— None of that—there is no state law claim anywhere in this case, right? Correct, and that's because any such defamation-type action would be preempted by the FCRA. I mean, you're not even—you wouldn't even be able to argue—take out the preemption for a second. I mean, you have no state law causes of action generally, right? I mean, Texas could. I completely give you this. Like, Texas could pass a statute that would protect its consumers in this way, right, or they could regulate their access to their records in a way that would protect their consumers, but they haven't, right? There's no provision in Texas law that says if you take our information and you report it inaccurately, you're liable for causes of action 1, 2, and 3. That's correct. Question mark, yeah. Yes, as best I'm aware, there's no Texas analog to the FCRA. Many states do have an analog to the FCRA. However, as Your Honors are likely aware, by and large, those provisions generally contain substantively identical, if not textually identical in many situations, to the FCRA. Okay. I think we have your basic argument. You have time for rebuttal. Thank you, Your Honor. Mr. Slaughter. Good morning, Your Honor. May it please the Court, I am Ed Slaughter here for CLRA. With me on the brief is Mr. David Babb. Thank you for the opportunity to speak with you this morning. CLRA is a small business located in Hagerstown, Maryland. It's incorporated in Pennsylvania. It has 16 employees and one office. It sells access to companies like RentGrove. The search function available is not state-specific. RentGrove accessed the CLRA database to obtain criminal record information from their office in Massachusetts. RentGrove then sent a credit report to 2115, the apartment complex in Texas. Key, CLRA never published anything to Texas relative to this case. It provided access to its information to a Massachusetts company. How important is that particular fact if the client for CLRA was a Texas-based company doing something similar to what RentFlow does? Would there be specific personal jurisdiction in Texas? There wouldn't be in this case, Your Honor, even if RentGrove was a Texas corporation situated right next door to the apartment complex because in order to fix jurisdiction, it must either arise out of or relate to, assuming, for argument's sake, the Ford case applies here. The information that was made available by CLRA was publicly available information they aggregated. There's not any argument or allegation that they damaged that information or altered it or did anything that ultimately caused any— I thought the allegation was that you negligently obtained and produced errant information that was not actually in the public record. Is that clear one way or another? Does the public record actually say he was convicted or accused of terrorist activities? What is the evidence in this record of what was actually in the Texas record versus what CLRA reported? There's absolutely no evidence in this record that CLRA reported anything other than what was available. Misreported. There's no evidence that CLRA misreported anything? Correct. That's exactly the point. And I think it's important here, under your hypothetical, even if RentGrove had been located in Texas, there is no action that caused or contributed to cause an ultimate harm to Mr. Boyd. So wherever it may have been sent, it wouldn't have been sufficient. But in the facts of this case, it's also true that CLRA never published anything to the state of Texas. And if you look at the case law that appellant relies on, all of those cases deal with purposely availing oneself of the jurisdiction, specifically, in most of them, publishing something, sending something directly to that state. I think that that's critical to the facts of this case. Beginning at the beginning, I think it's important that the issue here really is about a failure of pleading. Ultimately, obviously, the court has to give deference to allegations that are well-founded, that are made by plaintiff appellant. What happened here was there was no prima facie case ever pled whatsoever. The pleadings were deficient because they didn't set out the who, what, where, when, how, or why. They simply said that CLRA was, quote, doing business in Texas and that CLRA collected data from Texas. The court found that those pleadings were insufficient to make a prima facie case. This court has made plain in Panda Brandywine that, sure, you have to give them the benefit of the doubt, so to speak, but their pleadings have to go beyond mere conclusory allegations. They've got to have some meat to them, and here they did not. I'm very confused. Your answer to Judge Southwick was there's no allegation, because you keep talking about evidence. We're on 12b-2, right? Okay. So in the amended complaint, is that the operative one, or was there a second amended? First amended. Okay. So I'm looking at the first amended. There are allegations in here that the report said — I'm sorry, the report that you provided to RentGrow was inaccurate, and it says that like 30 times in the complaint, and it says even a cursory review of the underlying material would not have reported it as a conviction. And you keep telling Judge Southwick that there's no allegation, there's no allegation, there's no evidence that you did anything wrong. There's like a bunch of allegations that you didn't look at the record and you reported something that was not supported by the underlying fact that you could have determined if you weren't negligent in reading the material that you disclosed to RentGrow. So help me understand what you're saying to Judge Southwick. My apologies if I wasn't clear. I think what the allegations say is they claim that something inaccurate was transmitted by CLRA to RentGrow. I don't see anything pled, any facts pled that say CLRA did something wrong that CLRA damaged or altered information that it transmitted. It said you misunderstood it and you didn't read it. It said that maybe there was an allegation, or maybe he was indicted or charged or whatever with this underlying crime but never convicted. And you reported it as a conviction. That's a well-pled fact. Now, you may disagree with it, and God knows, like, that's why we have all manner of federal proceedings to figure that out. But, like, the allegation is in here over and over again. I don't think that that allegation sets forth anything other than conclusions, and I don't think that that allegation actually claims that we failed to do something that we should have done or did something that we shouldn't, that it articulates some sort of negligence other than we simply – we didn't really transmit this to someone. We collected information into a database from a public record and then gave access to RentGrow to come get it and look at it and use it as they would. Was this terroristic threat thing in the criminal records of Texas? I assume that had to do with some marriage breakup or something. Your Honor, I don't know the underlying facts if it was a marriage or something. But it was a terroristic threat, right? I understand that. And it was like an NCIC search, right? That sounds correct to me, Your Honor. I mean, NCIC, as I understand it, records arrests, but it doesn't record much else. Counsel, let me ask you – or maybe – Right or wrong. I thought you were going to nod at yes, but go ahead and answer Judge Jones's question. No, that's okay. Let me ask you. Let's say we don't understand the complaint in the way you do, hypothetically, and we do say that there's an allegation of misreporting information that was found in whatever the relevant records are. How does that affect the analysis? It ultimately doesn't change the result in the case, Your Honor. The facts, even if you assume that that was true, the fact is all we did was make available data that was collected by CLRA, made it available to a company. Well, no, I'm saying assume, and I don't think you are assuming, that you're actually misreporting what you collected, that you put an error into your report that was not. Again, this is hypothetical. Let's say we do, in fact, accept that that's the proper interpretation. You don't have to accept it. Let's say we do. That seems to me it affects the analysis you're giving us, so deal with that. Help me with that. I don't think the pleading supports that, and I'm glad that I think that. It's better if it doesn't, but I don't think it would change the analysis because it's still too attenuated. Because all we do is make available information that's been collected to a third party as a vendor in Massachusetts, even if it meant that we did something imperfectly, it wouldn't be the ultimate cause of anything that happened in Texas. Counsel, I'm worried that you are arguing yourself straight into jurisdictional discovery because Judge Southwick is asking you to assume what the complaint says, and you're saying, well, we didn't do it then. We just made it available. That's not what the complaint says. The complaint says over and over again you looked at a record that said X and you reported that as Y. So either you have a legal argument to that or you're arguing yourself straight into a massive dispute with your friend on the other side about what you did. I don't understand how that bears on jurisdiction. I don't either, Your Honor. So arguing the hypothetical, even if it happened, I don't think it would change anything. And the reason it wouldn't change anything is there's two ways that you can fix jurisdiction if we give credence to Ford in this case. One is arises from and the other is related to. It cannot arise from anything that we did unless that action took place in the state of Texas. We must purposefully avail ourselves of the benefits and protections of the state of Texas and do something there that caused the harm. All that was done was the collection of data from Texas, so there would be no purposeful availment regardless of whether we accept the facts. Well, it's not all you did. You then provided it to your client, which gets back to my earlier hypothetical, if your client was actually in Texas, which would seem to me make a harder case for you. Well, the analogy here would be if, and I don't remember what happened in the Ford case, but suppose it was a warranty breach and there was something in the brake situation in the Ford and the Supreme Court says that the state court has jurisdiction over or that Ford has to be sued in whatever state it was, but that's not the same thing as saying that the brake manufacturer or the subcontractor who supplied the brake to Ford can necessarily be sued. To me, that's the position that clears us in. So I think it's absolutely correct. I'll bet you do. And it's helpful to me, and I appreciate it. Dealing first with the arises from element, that's obvious. That's clear. Appellant is not really even pressing that. We took no action in the state of Texas to give rise to jurisdiction. If the Ford case applies, if it was raised properly, it still wouldn't help appellant in this case. The facts of Ford are so dramatically different. It's why I started by saying Clear is a small company with 16 employees and one office. Ford was a little bit bigger than that. And what Justice Kagan's opinion in Ford said was, look, the exact same cars are being sold in the forum states as the cars that are at issue in the case. There are 84 dealerships in one, 36 in another. They sell parts. They do service. They do maintenance. They could reasonably expect to be hailed into those forums for a problem exactly like this. It was identical. Counsel, let me help you. Let me see if I can help you even more and make you even smaller. So instead of having 16 employees in Hagerstown, Maryland, let's say you have one or two, and instead of having however many clients Clear has, let's say you have one, and it's called RentGrow, and it's headquartered in Austin, Texas, and it supplies the same information passively the way you do it to a rental agency background checking group in Austin, Texas. I understood your question to my friend Judge Southwick earlier to say even if RentGrow was headquartered in Austin and you only had one contract to provide background information to a company in Austin, Texas, you're still not subject to specific personal jurisdiction in Austin. How? I'm glad that those aren't the facts of my case. We're going to do this over and over today, but I'm going to keep asking. Yes, but I would stand firm that that would not be sufficient. You would have to have something that arises in the state of Texas, some conduct that we took to the state of Texas. Is it a closer case if information was exchanged with RentGrow while they were physically situated in Texas? Sure. That's a harder case. But I still don't think it quite gets there because of the attenuation between that transfer of information and the ultimate harm that's claimed here because it passes through other hands who made independent judgments about whether or not to pursue it. Ultimately, we do get to a policy question here, which I think is important. Yes, the FCRA is an important piece of legislation that the federal government has an interest in being pursued, but there's no harm here. There's no risk here. Why? Because the FCRA clearly provided personal jurisdiction over RentGrow. If there was any harm to Mr. Boyd, it was one harm and one harm only, the publication of information that made him lose a chance at an apartment or perhaps damage his reputation. Is there anything that you could have said to RentGrow that would be actionable under the FCRA? I mean, you admit you are amenable to suit under the FCRA, yes? You just think it should be in either Maryland or in Pennsylvania? Or some other appropriate state, given the set of facts.  But I don't understand why you're— It's not a case about liability. It's about specific jurisdiction. Correct. You could be liable under FCRA, but that doesn't say you're subject to jurisdiction in 50 states. Absolutely. Let's make it easier. Let's say instead you have—instead of having 16 employees, let's say you have 1,600, and instead of doing passive searching, you send your people to court reports—to do court reports by hand, right? You do the old-fashioned way, and you send people down to the courthouse to transcribe the records. If those were the facts of the case and you sent people down to Texas to do the search on Mr. Boyd, would you be amenable to suit in Texas then? Only if the specific actions that we took arose in Texas and actually caused the harm. So it wouldn't— You went down. You looked at the records of Mr. Boyd, old-fashioned, you know, leather shoe reporting, right? And you look at the thing. It says that he was charged, and you reported as he was convicted. Yes or no? Are you amenable to suit in Texas? I would still say under those facts, if we sent that information to RentGro and not directly to the apartment, that we would not be subject to— I understand your argument. —in Texas. All right. The arises to is awfully clear, and every one of the cases that plaintiff-appellant relies on just doesn't quite match. All of the district court cases obviously are not controlling, but all of those involve purposeful actions, direct publication. The Eighth Circuit cases that they use also just don't fit the case because there's all direct actions, publication to the forum state rather than data collection from. If there was a rule to emerge here, I would hope it would be mere data collection from a forum does not subject you to personal jurisdiction there. That's all that was done in this case, and that should not be sufficient. The court has looked at this concept of whether or not nationwide work is sufficient to set personal jurisdiction in a specific state or any state. I think the court in Atmar called it the greater doesn't include the lesser. It gives me a chance to at least mention the Mick Jagger case because I wanted to say he did finally get satisfaction somewhere, and I was desperate to figure out where I might get to do that. This court has looked at questions like this and set out a pretty simple three-part test to be used that you don't need to hear again from me, and none of those criteria match this case. The defense distributed case and the Weiner v. Brandt cases both dealt with direct actions into the state of the forum, and ultimately that was why there was personal jurisdiction in those cases. We simply don't have it here. I'll end without using the last three minutes but 30 seconds to say I do think policy matters, and suggesting that not allowing or not fixing personal jurisdiction in every single state for an entity like CLRA would set the worst possible example. Well, think of eBay. Think of the little arts and crafts person on Etsy whose product is advertised all over the Internet by virtue of Etsy. This theory would mean that the arts and crafts person could be sued all the way across the country if there's a breach of contract or the little whatever it is blows up. Right. I mean it. And I think it's particularly dangerous and damaging to folks on Etsy or small companies like CLRA, but even for eBay there's still got to be some reasonable fairness that they should reasonably expect to be hailed into court somewhere, and simply having a website where people can come and buy things ought not be enough just as data collection ought not be enough. Thank you very much. I appreciate it. All right, sir. I'm sorry. My apologies with my 1.48 left. Jurisdictional discovery. It wasn't properly requested. It wasn't meaningfully asked for. They didn't obtain an order on it one way or another, so there is nothing for them to appeal here. Moreover, it's not appropriate because you must get beyond conclusory allegations and make a primary case before you're entitled to it. Thank you. All right, sir. Okay, Mr. Ristvedt. May it please the Court, Your Honors. I think that Judge Oldham's line of questions are particularly salient and on point as it relates to CLRA's position, and a lot of CLRA's position revolves around this sort of stream of commerce theory that they're enumerating where you're never subject to specific personal jurisdiction unless you specifically are the one to communicate information into the forum state. No, unless you are the—well, I mean, I don't know whether that's Judge Oldham's view or not, but my problem is that you are a remote supplier of information to where it ultimately went, so there's no direct connection between you, your plaintiff, and CLRA. And see, I think the issue with that theory, Your Honor, is that like the acai metals case, the issue there was that the manufacturer had no contacts with the forum state. They were just a part of a whole that got brought into the state as a consequence of being one part of a bigger machine. CLRA's contention is that we're just this one part of this background report, and RentGro is bringing us into the state of Texas. That's not how CLRA got associated with the state of Texas. Texas was reached into repeatedly by CLRA over and over again so that CLRA could obtain public records, Your Honor, and CLRA purchased those public records presumably pursuant to a contract with either state agencies or public records services like courts through which entities like CLRA have contracts all the time. So the notion that CLRA's only potential contact with Texas is this one isolated, fortuitous incident where Mr. Boyd was subject to a background report is in a posit because CLRA's actual contacts with Texas have been continuous for years, reaching into Texas to obtain public records. It seems to me you're—I'm sorry, Chief. No, go ahead. It seems to me you're blending into general jurisdiction almost from your arguments. We're still looking at the specific personal jurisdiction necessary here, and your argument really is there's a continuous presence by companies like CLRA in every state, it sounds like. And I think that if they choose to operate in a manner where they are required by part of their business model to have those types of continuous ongoing contacts that ultimately harm consumers like Mr. Boyd as a consequence of inaccurate reporting, then they ought to be concerned about being hailed into court in those jurisdictions. Again, there's nothing that necessitates or requires CLRA by law or any other reason to do business where they obtain public records from the state of Texas. They choose to do so because it is a business decision and it's profitable for them. So if they're going to have the benefit of reaching into Texas, benefiting from Texas' maintenance of public records, then they ought to be concerned about— Reaching into Texas is not your harm. You're saying after they reached in, they mischaracterized what they found, and that's where the harm arises. Right, and I'm saying that their overall conduct, Your Honor, relates to Mr. Boyd's harms. In other words, their business practices of consistently reaching into the state of Texas are directly related to Mr. Boyd's harms. If CLRA did not maintain these business practices where they consistently profited off the sale of Texas public records, they would have never met John Boyd, period. So the notion that his harms are unrelated to CLRA's conduct, it has no basis in fact, because again, if it weren't for CLRA's consistent reaches into Texas, Your Honors, there would be no basis for a claim between Mr. Boyd and CLRA. The last item I at least want to address, Judge Southwick, you had asked counsel whether or not the information was misreported. I do want to make one correction to the record. The information that has been uncovered thus far in this case has made abundantly clear that, in fact, CLRA did add notation to the public record beyond what was just contained within the public record. There was no notation that said DOC supervision contained within the actual public record, and CLRA chose to add that notation to the report. So again, this idea that CLRA made no—I think CLRA refers to this concept of intentional tortious conduct. We haven't intentionally committed some tort where we're reaching into Texas. The standard is not that someone commit an intentional tort as part of their conduct. It's that they have an intentional reach into the forum state. The intention is with respect to the conduct as opposed to the tort. They're both modifiers of the term conduct in that context. So ultimately, Your Honors, as I've stated, we believe this case should be reversed. If not, again, if this Court is inclined not to reverse the district court's holding, we would ask that you vacate the district court's holding so that we can engage in some modicum of jurisdictional discovery to ascertain whether or not, in fact, CLRA does have the contacts we believe to exist. All right. Thank you very much. Thank you very much, Your Honors. All righty. That concludes our oral arguments for today. The Court will stand in recess until 9 o'clock tomorrow morning. Great. My book has fallen apart.